Petition of the CITY OF LIBERTY, Missouri, for a Pro Forma Decree Authorizing the Issuance and Adjudicating the Validity of $160,000 Principal Amount of Public Parking System Revenue Bonds, Series A, of said City.

CITY OF LIBERTY, Missouri (Petitioner), Appellant,

v.

William H. JONES (Intervenor), Respondent.

No. 45614.

Supreme Court of Missouri. En Banc.

Dec. 10, 1956.

**118**

William E. Turnage, Liberty, Robert B. Fizzell, Robert B. Fizzell, Jr., Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, for the City of Liberty, appellant.

Arthur R. Kincaid, Liberty, for respondent.

LEEDY, Judge.

This is a proceeding under Sections 108.-310 to 108.350, RSMo 1949, and V.A.M.S. It originated in the Circuit Court of Clay County upon the petition of the City of Liberty for a pro forma decree authorizing the issuance and declaring the validity of "Public Parking System Revenue Bonds, Series A," of said city in the principal sum of $160,000. Respondent Jones, a taxpaying citizen, filed an intervening petition, Section 108.320, contesting the validity of the bonds. The trial court held them invalid, entered its decree accordingly, and the city has appealed. The facts are not in dispute, and the issues are those of law.

The City of Liberty grew in population from 4709 in 1950 to 6300 in 1955. At the time of trial, it was maintaining 299 curb line parking meters in the central business area. Receipts from these on-street parking meters increased from $13,534.50 in 1950 to $17,378.50 in 1955. There was an even greater increase, percentagewise, in the sale of city automobile licenses during the same period. As in the case of other cities, large and small, the parking problem has become increasingly acute in the downtown or central business district where the city proposes to maintain the off-street parking facilities for which the bonds are to be issued. In keeping with current trends, the recent expansion of business into the city's outlying districts along the main highways (69 & 71 by-pass) has been accompanied by provision for customer parking on the premises. There has been marked building activity in several areas of the city, notably in the southwest section. The area is developing somewhat rapidly, and the city has extended its limits in recent years so as to embrace considerably more territory.

The purpose for which the proposed bonds are to be issued and marketed is to finance the purchase of certain real estate lying within the city, and to equip the same for use by the public as off-street parking facilities for motor vehicles. To this end, the city council on December 16, 1955, passed Ordinance No. 1894, which is now under attack. The ordinance declares that "the public interest, welfare, convenience and necessity" require that certain described lots in said city (five in number) be acquired by it for the public parking of motor vehicles; authorizes the issuance of "Public Parking System Revenue Bonds, Series A, of the City of Liberty, Missouri," in the amount of $160,000 "for the purpose of paying the cost of planning, designing, acquiring, constructing, equipping and improving" the aforesaid property for the parking of motor vehicles; defines " 'parking system' or 'parking facilities,' " as used in said ordinance; prescribes "the form and details of said bonds, and the covenants and agreements made by the city to facilitate and protect the payment thereof;" and provides for the collection, segregation and application of the revenues of the parking system of said city for the purpose of paying the cost of operating and maintaining said parking system, paying the interest on and principal of said revenue bonds, and for adequate reserve accounts.

The bonds are not to be a general liability of the city, nor payable from taxes, but to

"be payable as to principal and interest solely from the revenues derived by said City from the operation of the parking system of said City."

The questions for decision are: (1) Whether an act of the General Assembly, Section 71.360 RSMo 1955 Supplement, V.A.M.S., which authorizes the pledging of proceeds from on-street parking meter receipts to the retirement of revenue bonds for off-street parking facilities is constitutional; (2) whether certain of the city's covenants, as provided in the ordinance, are valid; and (3) the legality of the ordinance provisions creating certain separate funds or accounts for handling the revenues derived from the operation of the parking system.

Section 71.350 authorizes incorporated cities and towns of not more than 700,000 population (such as the City of Liberty) to acquire, improve and equip property as and for off-street parking facilities, and to operate such facilities, and to make a charge for the use of the same. This statute, together with another section, 71.360 (providing methods for financing such facilities), was enacted in 1947. Laws 1947, p. 392. As originally enacted, the latter did not contain provisions authorizing a city to pledge the revenue of its on-street parking meters to the retirement of revenue bonds issued to finance off-street parking facilities, but by an amendment made in 1955, Laws 1955, p. 300, Section 71.360 RSMo 1955 Supplement, V.A.M.S., this contingency was expressly provided for, so that said section, as amended, authorizes the financing of such facili-

ties "by any one or combination of the following methods:

"(1) General revenue funds, including any proceeds derived from the operation of the parking facilities, *including the proceeds, or any part thereof, derived by the city or town from its on-street parking meter receipts;*

"(2) General obligation bonds within legal debt limitations;

"(3) Negotiable interest-bearing revenue bonds, the principal and interest of which shall be payable solely from the revenues derived by the municipality from the operation of the parking facilities, *and from the proceeds, or any part thereof, from on-street parking meter receipts of the city or town, which proceeds, or any part thereof may also be pledged by the city or town to the retirement of the negotiable interest-bearing revenue bonds,* which revenue bonds may be issued and sold by the municipality when so authorized by the city council, board of aldermen or other legislative authority of the city." (The amendment of 1955 is represented by the words we have italicized.)

As indicated earlier, the city, by the ordinance in question, adopted the revenue bond method prescribed in paragraph (3) of the above statute, and combined or unified its on-street and off-street facilities as a single parking system.[1]

■ The first of intervenor's contentions is that the 1955 amendment is unconstitutional, and hence the ordinance enacted in pursuance thereof is also invalid. He as-

---

1. "The term 'parking system' or 'parking facilities' as used in this ordinance shall include all motor vehicle parking facilities of the City of Liberty, Missouri, including but not limited to all parking meters or devices for obtaining revenue from on-street and off-street parking, all City owned or leased or operated parking lots, garages, buildings and other facilities which provide public parking, all real estate owned or leased by the City and used in operation of the parking system and

facilities of said City, all extensions, improvements, enlargements and additions to the parking system of said City, including parking equipment, real estate, garages and buildings and all other property, tangible or intangible now owned or hereafter acquired by said City in connection with the operation of the parking system and facilities of said City, including all franchises, licenses, leases and contracts."

serts that off-street parking facilities by their very nature constitute a special privilege, and upon this premise argues that the statute and ordinance are unconstitutional and void because violative of that portion of Art. I, § 13, Const. of Mo., V.A.M.S., which provides that no law "making any irrevocable grant of special privileges or immunities, can be enacted." The only other constitutional provisions referred to in intervenor's argument are § 1 and § 2 of art. I, the Bill of Rights, which, respectively, contain declarations and provisions touching the source of political power, the origin, basis and aim of government; promotion of the general welfare, natural rights of persons, equality under the law, and purpose of government. The reason intervenor claims these measures offend against the latter provisions is thus stated in his brief: "Even if a case can be made for the proposal being in the interest of the welfare of all of the people as of now there is no possible basis for saying that it will be to the best interests of the people during the life of the bonds to have on-street parking facilities regulated not by public need, but by welfare of the bondholders." It is our view that off-street parking facilities are in no sense a special privilege, nor does the express authorization of the statute for the pledging of future revenues from both on-street and off-street parking facilities do violence to the principles of the Constitution that, as intervenor puts it, "governmental powers are solely for the good of all, and that constitutional government is intended to promote the general welfare of the people." We therefore hold no constitutional infirmity inheres in either the statute or the ordinance by reason of any of these claimed violations of the sections here invoked.

■ Respondent attacks the validity of the covenants set forth in subsections (a), (c) and (e) of § 9 of the ordinance, which covenants are to run so long as any part of the bonds remain outstanding and unpaid. Said subsections provide, respectively, as follows:

(a) That the city will establish, maintain and collect such reasonable charges for the use of the services and facilities of its parking system as will produce revenues sufficient to pay the reasonable cost of operation and maintenance of the system, and to pay the interest on and principal of the bonds as and when they become due.

(c) That the city "will maintain parking meters and collect rates from them on all public streets in the City where such parking meters are located on the date of the passage of this ordinance and on such streets and in the off-street parking facilities system where parking meters shall hereafter be located; provided, however, that the City shall have the right to make such changes in the location of parking meters as are necessary in the judgment of the City Council because of changes in the streets of the City, such as the widening or closing thereof, and changes in the location of parking meters deemed necessary for traffic regulation and control. The City covenants and agrees that it will at all times endeavor to make any such changes in a manner that will not materially reduce the revenues at the time being derived by the City from the operation of its off-street parking facility and on-street parking meters."

(e) That the city "will not acquire, construct, operate, maintain or finance other off-street parking facilities which would materially affect unfavorably the revenues from the parking facilities described in Section 1 hereof."

Respondent contends the foregoing covenants are unreasonable, illegal and void, and constitute a bargaining away of the police power of the city. Such was the holding of the trial court with respect to (c) and (e). These or similar contentions have been before the courts of other states in one form or another with such frequency as to leave no doubt in our minds as to their proper solution. The North Carolina case of Britt v. City of Wilmington, 236 N.C.

446, 73 S.E.2d 289, upon which the trial court apparently based its decision, supports respondent's claim, but the decided weight of authority is to the contrary. For example, in Parr v. Ladd, 323 Mich. 592, 36 N. W.2d 157, 8 A.L.R.2d 357, the Village of Wayne had combined its on-street and off-street parking facilities into a single system, and authorized revenue bonds payable from the revenues of the entire system, as in the case at bar. Under the statute there involved, which was less definitive than our own, the combining into a single system of facilities for both on-street and off-street parking for which a charge would be made was upheld, as well as the municipality's power to pledge net revenues therefrom for the acquisition of off-street property, and the operation and maintenance thereof as a part of such system. It was further held that the municipality had the power to issue revenue bonds payable solely out of net revenues derived from the operation of such system, and to pledge such net revenues for payment of such bonds; and that the municipality had the power to pledge itself to acquire and maintain parking meters on such street and off-street property, and charge rates for the use of such facilities to provide for the payment of such bonds.

In the very recent case of Skidmore v. City of Elizabethtown, Ky., 291 S.W.2d 3, 5 (decided May 25, 1956), the proposed issue of revenue bonds by the city was to acquire off-street parking facilities, which the ordinance there in question purported to combine with the city's on-street parking facilities as a single public project, the bonds to be secured by a pledge of the revenues of the on-street parking meters and the off-street parking lots, as here. It was there argued that since parking meters can be justified only under the police power, it is improper to utilize them as the source of revenue, and a pledge of revenues therefrom is unconstitutional. (Note the similarity of respondent's position in the case at bar: "* * * the 1955 amendment did not change the fundamental fact that a municipality can only charge for on-street parking privileges in the exercise of its reasonable police power. Time and again the courts have held that parking meter charges must bear reasonable relationship to the costs of traffic regulation. * * * We submit that if future on-street parking meter receipts can be pledged for the repayment of debt contracted to construct off-street parking facilities that the amount of such receipts and charges will not be in any manner based upon the cost of meter installation and maintenance or of traffic regulation but will be an additional tax upon certain motorists using on-street parking facilities which will bear no reasonable relationship to the cost of traffic control.") In answering the proposition there advanced, the Court of Appeals of Kentucky said: "This argument overlooks the fact that the basic police problem which parking meters are designed to meet is that of traffic congestion and traffic regulation. It is a basic principle that fees or charges imposed under the police power must be reasonably related to the cost of meeting the particular police problem. Here, we think it is clear that the matter of parking, both on-street and off-street, is all part of the main traffic regulation problem, and therefore there is nothing improper in utilizing excess revenues from the parking meters to meet the costs of the overall traffic regulation police problem, or in fixing the parking meter fees at an amount that will produce such excess revenue." In disposing of the contention that the city had bargained away its police power, the court used this language, with which we are in full accord: "A further contention is that, because the city has covenanted to continuously operate the parking facilities for the period of the bonds, and to charge and collect sufficient fees to retire the bonds, and because provision is made for appointment of a receiver to operate the facilities in the event of a default, the city has unconstitutionally surrendered or bargained away its police power. We think a sufficient answer is that the or-

dinance reserves to the city the power to make appropriate changes in the location of parking meters made necessary by street widening or closing, or by the requirements of traffic regulation and control. Similar contentions, with respect to substantially identical ordinances, were made and rejected in Poole v. City of Kankakee, 406 Ill. 521, 94 N.E.2d 416; State ex rel. Bibb v. Chambers, 138 W.Va. 701, 77 S.E.2d 297; and Comereski v. City of Elmira, 283 App. Div. 556, 128 N.Y.S.2d 913. We concur in the views expressed in those opinions, on the question of surrender of police power."

As to respondent's objection to § 9(a), it is sufficient to say that the fact that the ordinance definition of "parking system" includes "all extentions, improvements, enlargements and additions" would not render illegal, as an abdication of the city's police power, the pledge of future revenues from the entire system, as distinguished from that which the city presently seeks to operate.

It is to be noted that the covenant contained in § 9(c) with respect to maintaining parking meters on all public streets where located on the date of the passage of the ordinance also contains a proviso which saves it from that meaning which respondent would ascribe to it, that is, that "regardless of future traffic congestion existing meters cannot be changed and the city's power to remedy the situation would become just a fond memory." On the contrary, the covenant, through the proviso, contemplates and recognizes the right of the city to make changes in the location of on-street parking meters—not only those made necessary by reason of changes in the streets, but also such as are "deemed necessary for traffic regulation and control."

The covenant, § 9(e), against acquiring, maintaining or financing other off-street parking facilities so long as any of the bonds remain outstanding and unpaid is not a prohibition against all such activities, but is directed against only those "which would materially affect unfavorably the revenues from the parking facilities described in Section 1 hereof [the proposed off-street parking facilities]." In other words, the city engages that it will not itself put other off-street locations in competition with those facilities to be created out of the proceeds of these bonds. The argument is made that if future development in other sections of the city require similar facilities, the city would be powerless to furnish them during the life of the bonds. This is a misapprehension. Indeed, the city would be free to proceed with such projects unless the same would—in the critical words of the covenant—"*materially affect unfavorably*" the revenues from the facilities financed by these bonds.

In view of the meaning and effect of these covenants, as thus interpreted, and upon the reasoning and authority of the cases above cited, we hold the attack upon them (as constituting a bargaining away of the city's police power) is not tenable, and so disallow the claim that they are unreasonable, illegal and void for such reason.

Respondent's other attack is that § 7 of the ordinance provides for the creation and maintenance of six separate funds for the purpose of segregating and handling the revenues derived by the city from the operation of the parking system, which funds are designated, and to be known, respectively, as follows:

"(a) 'Public Parking System Revenue Fund,'

"(b) 'Operation and Maintenance Account,'

"(c) 'Sinking Fund Account for Public Parking System Revenue Bonds, Series A,' sometimes hereinafter referred to as the 'Sinking Fund Account,'

"(d) 'Reserve Account for Public Parking System Revenue Bonds, Series A,'

"(e) 'Replacement and Emergency Repair Account,' and

"(f) 'Public Parking System Surplus Account.'".

Respondent states his objection to these funds as Point III of his brief in this language: "There is no legislative authority for the creation and maintenance of the six separate funds purportedly established by Section 7 of the Ordinance and the provisions relative thereto are unreasonable and void." However, in his argument, the only specific mention of any of them is the "Reserve Account," in respect to which the ordinance provides that upon the issuance and delivery of the revenue bonds, the city will credit to and deposit in said reserve account $15,000, or U.S. Government obligations or bonds having a par value of not less than that amount. All amounts credited to and deposited in said account are to "be expended and used solely to prevent any default in the interest on or principal of" the bonds in question if the moneys in the "Sinking Fund Account" are not sufficient for that purpose.

 It is true that the statute which provides for the financing of such facilities does not descend into particularities, nor in terms spell out the mechanics for carrying its purposes into effect; but such is not required. The rule is that " * * * where there is an express grant to a city without the method or details of exercising such power prescribed, the City Council has authority to exercise the power granted it in any reasonable and proper manner." Dodds v. Kansas City, 347 Mo. 1193, 1200, 152 S.W.2d 128, 131. See, also, State ex rel. City of Fulton v. Smith, 355 Mo. 27, 194 S.W.2d 302. Consequently, we hold that express statutory authority for the creation of the challenged funds is not necessary, and that the provisions of the ordinance touching the funds in question do not offend against, but, on the contrary, are sustainable under, the rule of the Dodds and City of Fulton cases, supra.

The decree of the trial court should be reversed, and the cause remanded with di-rections to enter one authorizing the issuance and declaring the validity of the bonds as prayed by the city. It is so ordered.

All concur.